J-A13021-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: W.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1490 WDA 2024 |

Appeal from the Order Entered October 30, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000112-2023

BEFORE: BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED: JULY 28, 2025**

J.M. ("Father") appeals from the October 30, 2024 order involuntarily terminating his parental rights to his daughter, W.M. ("Child"), born in November 2018.[1]  After review, we affirm.

We gather the following relevant factual and procedural history from the certified record.  Allegheny County Office of Children, Youth and Families ("CYF" or "the Agency") obtained emergency protective custody of Child on August 10, 2021, due to allegations of substance abuse and intimate partner violence ("IPV") involving Parents.  **See** Joint Statement in Absence of

---

[1] Child's biological mother, K.A.H. ("Mother," and collectively with Father, "Parents"), executed a consent to adoption on October 25, 2024.  **See** N.T., 10/25/24, at 66; **see also** Petition to Confirm Consent to Adoption and Terminate Parental Rights, 12/3/24.  Mother did not participate in the instant appeal.

Transcript, 1/27/25, at 6.[2]  The court confirmed the Agency's custody by shelter care order on August 13, 2021, and adjudicated Child dependent on October 20, 2021.  *See id.*  Child was removed and placed with family friends, and then in kinship care with a maternal aunt until May 2024.  *See id.*; *see also generally* CYF Exhibit 1*.*  In May 2024, Child was moved to her current foster care placement, where she remained at the time of the subject hearing.  *See* Joint Statement in Absence of Transcript, 1/27/25, at 9.

The juvenile court established Child's permanency goal as reunification and ordered Father to, *inter alia*, engage in a drug and alcohol evaluation; attend weekly random urine screens; submit to a mental health evaluation; and participate in IPV counseling.  *See* Joint Statement in Absence of Transcript, 1/27/25, at 6; CYF Exhibit 1, Order of Adjudication and Disposition, 10/20/21, at 2.  Eventually, the court also required Father to obtain appropriate housing.[3]  *See* Joint Statement in Absence of Transcript, 1/27/25, at 7; CYF Exhibit 1, Permanency Review Order, 4/18/22, at 3.

---

[2] Due to an issue with the audio recording device, the beginning of the subject hearing, including a portion of the testimony of Agency caseworker, Rick Ogden, was not transcribed.  *See* N.T., 10/25/24, at 3, 65-66.  As a result, the parties submitted a joint statement in absence of transcript pursuant to Pa.R.A.P. 1923, appending a stipulation as to the missing testimony.  *See* Joint Statement in Absence of Transcript, 1/27/25.

[3] These requirements mirrored those set forth in the family plans established by the Agency.  *See generally* CYF Exhibit 3.

Additionally, the court provided Father "liberal" supervised visitation. *See* Joint Statement in Absence of Transcript, 1/27/25, at 6; CYF Exhibit 1, Order of Adjudication and Disposition, 10/20/21, at 2. Despite initially attending "pretty consistently," Father failed to attend visitation from approximately March to November of 2022, when visitation then resumed. N.T., 10/25/24, at 5; Joint Statement in Absence of Transcript, 1/27/25, at 6, 8. By this time, the court further mandated coached visitation. *See* Joint Statement in Absence of Transcript, 1/27/25, at 8; CYF Exhibit 1, Permanency Review Order, 10/24/22, at 3. As a result of the extended gap in visitation, the court issued an order finding that aggravated circumstances existed as to Father in December of 2022. *See* N.T., 10/25/24, at 5; Joint Statement in Absence of Transcript, 1/27/25, at 6. Notwithstanding, the court required the Agency to continue to provide reasonable efforts toward reunification. *See* Joint Statement in Absence of Transcript, 1/27/25, at 6; CYF Exhibit 1, Aggravated Circumstances Order, 12/14/22, at 1.

Throughout the ensuing dependency proceedings, the juvenile court conducted regular review hearings wherein it maintained Child's commitment and placement and continued to emphasize the aforementioned directives related to substance abuse, mental health, and housing. *See generally* CYF Exhibit 1. Between January 2022 and April 2023, the court largely characterized Father's compliance and progress as minimal. *See* Joint Statement in Absence of Transcript, 1/27/25, at 7; *see also generally* CYF

Exhibit 1. While Father engaged in and eventually completed IPV treatment, he did not complete the ordered drug and alcohol or mental health evaluations. *See* N.T., 10/25/24, at 12, 19-20; Joint Statement in Absence of Transcript, 1/27/25 at 7-8. He also failed to attend numerous drug and alcohol screens. *See* N.T., 10/25/24, at 18; Joint Statement in Absence of Transcript, 1/27/25, at 7-9; CYF Exhibit 5. Further, Father failed to secure independent housing. *See* Joint Statement in Absence of Transcript, 1/27/25 at 7-8.

On May 10, 2023, the Agency filed a petition to involuntarily terminate Father's parental rights to Child, then four years old, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[4] Ultimately, following several continuances, the orphans' court held an evidentiary hearing on the Agency's petition on October 25, 2024. The Agency presented the testimony of Mr. Ogden; Emily Messinger, client supervisor, Family Care Services of

---

[4] On June 21, 2023, the orphans' court appointed KidsVoice, Child's guardian *ad litem* in the underlying dependency proceedings, to serve as Child's legal interest counsel. The court determined there was "no conflict . . . that would prevent KidsVoice from accepting this appointment." Order, 6/21/23. Accordingly, the requirements of 23 Pa.C.S.A. § 2313(a) were met. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020) ("[W]e grant *sua sponte* review to evaluate (1) whether the orphans' court appointed counsel to represent the legal interests of the children and (2) if the appointed counsel also serves as GAL, whether the orphans' court determined that the child's best interests and legal interests did not conflict.").

Chambersburg;[5] and Dr. Beth Bliss, licensed psychologist, who conducted numerous individual and interactional evaluations from 2023 through 2024 involving Child, Parents, and Child's foster parents. By stipulation, the parties acknowledged Dr. Bliss as an expert in psychology and child psychology. *See* N.T., 10/25/24, at 34. The Agency further proffered numerous exhibits, which the court admitted.[6] Father, who participated either virtually or *via* telephone, and was represented by counsel, testified on his own behalf. Additionally, he presented the testimony of his sister, A.M.

Of relevance, Father testified that he suffers from "severe lung issues," which required him to be placed in a medically induced coma from September into October of 2022. *Id.* at 58; *see also id.* at 6-7. He currently uses a nebulizer and inhaler daily. *See id.*

By order dated October 25, 2024, and entered October 30, 2024, the orphans' court involuntarily terminated Father's parental rights to Child

---

[5] Ms. Messinger testified that she "work[s] with the foster parents and [Child] to ensure that needs are met, and [she has] worked with the parents to complete visitation." N.T., 10/25/24, at 21.

[6] We note with displeasure that the exhibits from this proceeding were not originally included with the certified record. We, however, pointedly remind counsel that the appellant bears "the responsibility to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Wint*, 730 A.2d 965, 967 (Pa. Super. 1999) (citations and internal quotation marks omitted); *see also* Pa.R.A.P. 1921 Note ("Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted).

pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).  On November 22, 2024, Father filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court filed an opinion pursuant to Rule 1925(a) on January 27, 2025.

On appeal, Father raises the following issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S[.A. §] 2511(a)(1), (2), (5), and (8) where there was not clear and convincing evidence of abuse, refusal, or neglect by Father and where conditions which led to the removal of the child either no longer exist or can be remedied within a reasonable time?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.[A.] § 2511(b) when the record would not support such a conclusion?

Father's Brief at 6 (unpaginated).[7]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

---

[7] Child, through her legal counsel, KidsVoice, filed a brief on appeal advocating for this Court to affirm the subject order involuntarily terminating Father's parental rights.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's

determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Accordingly, we analyze the decree involuntarily terminating Father's parental rights to Child pursuant to Section 2511(a)(2)[8] and (b) which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

---

[8] Given our disposition relative to Section 2511(a)(2), we need not review and make no conclusions as to the orphans' court's findings with respect to Section 2511(a)(1), (5), and (8). **See B.L.W.**, 843 A.2d at 384; **see also In re K.R.**, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (observing this Court may proceed to a review of one subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of Section 2511(a)(2), the party petitioning for termination must establish: "(1) repeated and continued [parental] incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citation omitted). We have long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *Id.* (citation omitted).

In challenging the orphans' court's finding of grounds for termination, including under Section 2511(a)(2), the crux of Father's argument is that "[t]here was insufficient evidence to prove that [he] could not provide essential parental care to [Child]." Father's Brief at 24 (unpaginated). He contends that he was working on his reunification goals and engaged in services related thereto, having "successfully completed" IPV services. *Id.* at 23-24 (unpaginated). He further maintains that Dr. Bliss recognized that he

demonstrated positive parenting skills and had established a "close, loving relationship" with Child. *Id.* at 23 (unpaginated).

As it relates to Section 2511(a)(2), the orphans' court stated:

The court finds that the repeated and continued incapacity or refusal of Father has caused Child to be without essential parental care, control or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, or refusal cannot or will not be remedied by Father in this case pursuant to 23 Pa.C.S.[A.] § 2511(a)(2). . . . Father did not follow through with any of the drug and alcohol screens, evaluation or treatment, and did not follow through with any mental health evaluation or treatment, and has not obtained his own housing.

Orphans' Court Opinion, 1/27/25, at 12-13 (cleaned up). We discern no abuse of discretion.

As indicated *supra*, in furtherance of reunification, Father was required to, *inter alia*, engage in a drug and alcohol evaluation; attend random drug and alcohol screens; participate in a mental health evaluation; engage in IPV counseling; and secure appropriate housing. *See* Joint Statement in Absence of Transcript, 1/27/25, at 6-7; CYF Exhibit 1, Order of Adjudication and Disposition, 10/20/21, at 2-3. Mr. Ogden confirmed Father's awareness of these obligations. *See* N.T., 10/25/24, at 3. Although Mr. Ogden testified that Father completed an IPV program, he testified that Father failed to complete a mental health evaluation. *See id.* at 12, 19-20. Mr. Ogden reported that Father also did not complete a drug and alcohol evaluation, despite repeated referrals, and was not attending drug and alcohol screens. *See id.* at 4, 12. Mr. Ogden stated, "[Father] has not followed through with

any of the drug screens in more than a year. He hasn't followed through with the [drug and alcohol] evaluation. He had contact with one of the workers I think at one time and that fell through[,] and he was ultimately discharged, but I think [ten] referrals and no progress made on that goal." *Id.* at 4. Of a total of 157 requested random drug and alcohol screens, Father attended twelve. *See* Joint Statement in Absence of Transcript, 1/27/25, at 9; *see also* CYF Exhibit 5. Finally, Father failed to secure independent housing. *See* N.T., 10/25/24, at 11-12. As a result, Mr. Ogden testified that Child was without essential parental care control and subsistence. *See id.* at 14. Father acknowledged his lack of independent housing and the need to obtain same in order to care for Child. *See id.* at 59, 61.

> Similarly, Dr. Bliss testified to Father's parental incapacity, as follows:
>
> Both parents, as I stated, were street homeless. Both parents were not receiving the services that they needed to receive and that I had recommended[,] and I understand have been part of their goals in this case.
>
> Both parents had not attended random urine screens or drug and alcohol evaluations, and I had significant concerns with their possible continued use of substances, which would certainly hurt parenting . . . . Essentially neither of the parents were able to meet or care for any of their own needs, . . . let alone to be able to care for a young child's needs . . . .

*Id.* at 48.

Based upon the foregoing, we discern no abuse of discretion by the orphans' court in concluding that termination of Father's parental rights pursuant to Section 2511(a)(2) was warranted. The record substantiates the

orphans' court's conclusion that Father's repeated and continued incapacity or refusal to complete his court-ordered permanency goals aimed at substance abuse, mental health, and housing caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See A.H.*, 247 A.3d at 443.

Moreover, the record confirms that Father cannot or will not remedy same. *See id.* At the time of the subject hearing, Child had been in care for over three years, and despite services, Father failed to achieve reunification. Indeed, Dr. Bliss testified to Father's lack of accountability, noting that "[h]e wasn't taking any meaningful steps to make things better or improve the situation. . . ." N.T., 10/25/24, at 44. We reiterate and emphasize that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See A.H.*, 247 A.3d at 443.

Since the record supports the orphans' court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to a review of the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. We remain mindful that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each

child's specific needs." *Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023). This inquiry is neither formulaic, nor mechanical. *See id.*

Our review must include consideration of the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has concluded, however, that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. As the Court has explained:

> Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. *See E.M.*, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

*Id.* at 1109-1110 (some citations omitted). As such, the *K.T.* Court distinguished "extreme emotional consequences" from an "adverse impact" to the child when parental rights are terminated. *Id.* at 1111. Moreover, the Court cautioned that a trial court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id.* at 1114. As such, "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *Id.*

A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional consequences" or significant, irreparable

harm. *Id.* at 1109-10. The evaluation of a child's respective bonds is "not always an easy task." *Id.* at 1106 (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

Additionally, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *M.E.*, 283 A.3d at 839 (cleaned up). Courts should also consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *K.T.*, 296 A.3d at 1106. Finally, we also note that a child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." *Id.*

Instantly, Father assails the orphans' court's finding that termination of his parental rights served the developmental, physical and emotional needs and welfare of Child pursuant to Section 2511(b). He baldly contends that he enjoys a valuable and beneficial bond with Child, which should be maintained, as follows:

> Father loves [Child] and has much to offer for her benefit. The relationship between Father and [Child] adds value to their lives. Termination would unnecessarily and permanently deprive [Child] of her relationship with Father, and it is not best for her needs and welfare. [Child] deserves to have her relationship with Father preserved, which can only be assured if Father retains his rights.

*Id.* at 26 (unpaginated).

- 14 -

In determining that termination served Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b), the orphans' court concluded as follows:

> The decision to terminate the parental rights of Father in this case [is] based upon [Child]'s needs and projected development of her physical and emotional needs as well as her welfare. [Child] is in a pre-adoptive foster home and clearly has a strong bond with both of her [f]oster [p]arents. Even though, in this case, [Child] also has a bond with her [f]ather such that severing that bond would have an adverse impact upon [Child], nevertheless, severing that bond would be in the best interests of [C]hild, pursuant to 23 Pa.C.S.[A.] § 2511(b).
>
> The [c]ourt is further aware that there is a lot of research on how children do with their foundational bedrock of safety, stability and security as opposed to children who lack this foundation. The [c]ourt also is aware that children who are exposed to violence are typically behind the starting line when given the nature of the effects, the long-lasting effects of adverse childhood experiences. [Child] has strong relationships with her [f]oster [p]arents, and according to the research, when children have strong or secure relationships with at least one caregiver, this can mitigate against stress in other areas of their lives.

Orphans' Court Opinion, 1/27/25, at 16. This is supported by the certified record.

While the record reveals that Father engaged in supervised visitation with Child, Father failed to attend scheduled visits from approximately March to November of 2022, when he then resumed visitation. **See** N.T., 10/25/24, at 5, 19; Joint Statement in Absence of Transcript, 1/27/25, at 6, 8. As best we can discern, he also did not participate for an unknown period of time beginning in the summer of 2023. **See** CYF Exhibit 2, Psychological Evaluation

- 15 -

Report, 10/10/23, at 6. Moreover, after more than three years and services including coached visitation, Father's visitation had not progressed beyond supervised. *See* N.T., 10/25/24, at 58.

At the time of the subject hearing, Father's supervised visitation was weekly, alternating between virtual and in-person visits. *See id.* at 7-8, 22. Ms. Messinger testified that, following Child's current placement in May 2024, a visit with Father was scheduled for May 31, 2024, with weekly visitation beginning on June 11, 2024. *See id.* at 21-22. At first, such visitation was virtual and then transitioned to alternating virtual and in-person visitation in July 2024.[9] *See id.* at 22. According to Ms. Messinger, since this time, Father participated in eight of 20 possible visits. Of those eight, three were virtual and five were in person. Four visits were missed "due to scheduling and illness or car issues," and the remaining visits were missed without explanation. *See id.* at 22-23. Mr. Ogden reported that Father last visited with Child two to three weeks prior to the subject hearing. *See id.* at 16.

Mr. Ogden described visits as going "well" but noted Father's failure to "direct" Child and that Child "really led the visits." *Id.* at 6. He further revealed reports of Father "nodding off during some of the visits." *Id.* When asked to describe the relationship between Father and Child, Mr. Ogden

---

[9] Mr. Ogden explained that visitation was in part virtual due to distance and transportation, as Child's current placement in Chambersburg, Pennsylvania was a three-hour drive from Allegheny County. *See* N.T., 10/25/24, at 8, 17; *see also id.* at 57.

- 16 -

replied, "I think it's more of a play date relationship. I don't know that it's father-daughter. She enjoys playing with him, but it's not like a father-child relationship . . . from what I have seen." *Id.* at 17; *see also id.* at 19.

Despite also indicating that visits went well, and that Child looked forward to them, Ms. Messinger shared Mr. Ogden's view of Father and Child's relationship. *See id.* at 23-25, 30-32. She stated, "I think there's a bond. Is it [a parent-child] bond? I don't believe so. [Child] is excited about seeing [Father]. It is a lot of fun and games whenever they see each other, so I think that's what she enjoys, enjoys the play." *Id.* at 30. In fact, Ms. Messinger testified that Child requested to end the first couple of virtual visits with Father early, referencing Child's desire "to go play." *Id.* at 26-27. Additionally, Ms. Messinger addressed two visits, one in-person and one virtual, which Father did not attend. While noting Child's initial disappointment, Ms. Messinger reported that Child then "went about her day as happy as could be," and "was fine and dandy," respectively. *Id.* at 25-26.

Moreover, Dr. Bliss conducted two interactional evaluations involving Father and Child.[10] As to the first evaluation in April 2023, which was a joint interactional evaluation also including Mother,[11] Dr. Bliss testified, "[Child]

_____

[10] Dr. Bliss indicated that several additional appointments were scheduled between summer 2024 and the time of the subject hearing; however, Father did not appear. *See* N.T., 10/25/24 at 49, 54.

[11] Dr. Bliss explained that initially a joint interactional evaluation was conducted as Parents had not yet separated. *See id.* at 35.

presented as being fearful of her father. . . ." *Id.* at 35. She described, "[Child] screamed when [Father] came near her. She said that she was afraid of him, and then she basically ignored him." *Id.* at 41. Dr. Bliss recounted that for the remainder of the interaction, "The dad was . . . sitting and mumbling things to himself . . . and either falling asleep or nodding off in the chair." *Id.* at 35-36; *see also id.* at 41. Therefore, Dr. Bliss observed "no bond or attachment" between Father and Child due to their "limited interaction." *Id.* at 41.

As to the second evaluation in September 2023, solely involving Father and Child, Dr. Bliss testified, "[Father] was more engaged in [Child's] play and interaction than the prior interaction, and he was able to meet her needs during that appointment, so it was a much more positive interaction throughout." *Id.* at 37. Dr. Bliss continued, "[I]t was a more positive interaction, but I still didn't really observe a bond or attachment between them. [Child] was comfortable, or more comfortable during that appointment. . . . [B]ut there still wasn't really a parent-child bond or attachment there." *Id.* at 42; *see also id.* at 47.

Thus, the record demonstrates that the Child's bond with Father is not necessary and beneficial. *See K.T.*, 296 A.3d at 1109-10. We reiterate that "[s]everance of a 'necessary and beneficial' bond would predictably cause **more than the 'adverse' impact that, unfortunately, may occur whenever a bond is present**. . . . [S]everance of a necessary and beneficial

relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." ***Id.*** (citations omitted) (emphasis added).

In contrast, Child is doing "really well" and "assimilated really quickly" in her current foster home, where she was placed in May 2024. ***Id.*** at 12-13; Joint Statement in Absence of Transcript, 1/27/25, at 9. Mr. Ogden testified that Child "loves being there." N.T., 10/25/24, at 13. He stated that Child's foster parents, whom she refers to as "Mom and Dad," provide "safety and security" and are "meeting all of [Child's] needs and welfare." ***Id.*** at 14-15. This was confirmed by Ms. Messinger. ***See id.*** at 28-29 ("[Child is] very comfortable in the home. . . . They make sure that her needs are met."). Further, both Mr. Ogden and Ms. Messinger observed affection between Child and her foster parents, and that they share a bond. ***See id.*** at 14, 29. Ms. Messinger described, in part, "Every time that [Child] leaves [her foster mother], [foster mother] gives her a hug and kiss and says, I love you. [Child] reciprocates back to [foster mother.]" ***Id.*** at 29. Mr. Ogden testified to Child's desire for her current foster home to be her "forever home." ***Id.*** at 14. He explained, "I'm not sure she has used the word adopted, but she wants to stay there." ***Id.*** Similarly, Dr. Bliss observed "positive" interactions between Child and her foster parents, as well as a bond. ***Id.*** at 49-52 ("They were very close. She wanted to share experiences with them. She looked to them to meet her needs, . . . .).

As to removal of Child from her current foster parents, Ms. Messinger testified as follows:

Q. Would you have concerns if that bond were to be removed?

A. Yes.

Q. Can you explain why?

A. This is a stable, loving environment for [Child] and she is in need of permanency. She is taken care of and loved like a part of their family biologically and to remove that would disrupt her whole life again. And now she is old enough to understand certain things, so if she were to be removed, she would not understand why.

*Id.* at 29-30. Dr. Bliss likewise expressed concerns if Child were removed and placed in another temporary situation as "instability . . . can make it more difficult for [children] to be resilient through this difficulty in their life." *Id.* at 52.

As such, emphasizing Child's need for permanency and that she is "thriv[ing]" in her current foster home, Mr. Ogden testified that termination of Father's parental rights will meet Child's needs and welfare. *Id.* at 15-16. This was confirmed by Dr. Bliss. *See id.* at 49.

Based on the foregoing, we discern no abuse of discretion by the orphans' court's conclusion that termination of Father's parental rights will serve Child's developmental, physical, and emotional needs pursuant to Section 2511(b). While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination

of parental rights. ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted).

Accordingly, we affirm the order involuntarily terminating Father's parental rights pursuant to Section 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/28/2025